STATE OF NEBRASKA, APPELLEE, V. DONALD G. MCDONALD,
APPELLANT.
430 N.W.2d 282

Filed October 7, 1988. No. 87-631.

Kirk E. Naylor, Jr., for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

Defendant-appellant, Donald G. McDonald, was, pursuant to verdicts, adjudged guilty of arson in the second degree in violation of Neb. Rev. Stat. § 28-503(1) (Reissue 1985), and of burning with the intent to defraud an insurer in violation of Neb. Rev. Stat. § 28-505 (Reissue 1985), and sentenced accordingly. He asserts the trial judge erred in (1) finding the evidence sufficient to support the verdicts, (2) instructing the jury with respect to aiders and abettors, and (3) failing to grant a new trial because of juror misconduct. We affirm.

## THE RECORD

In November of 1985, McDonald leased a building at Emerald, Lancaster County, Nebraska, from Daniel Lynch, out of which he did business as D & D Auto Supply. The following January, McDonald insured his business inventory against loss by fire through a $50,000 policy issued by Allstate Insurance Company. On March 22, 1986, he insured the contents of the building against loss through an all-risk policy of insurance, in a like amount, issued by Farm Bureau Insurance Company. McDonald caused this second policy to be issued in his son's name. Two days later, McDonald applied to AID Insurance Company, now known as Allied Group Insurance Company, for a third policy insuring his inventory against risk of loss in the amount of $46,000, and his business fixtures in the amount of $7,000. At approximately 1:45 a.m. on Monday, April 7, 1986, the building from which McDonald did business was destroyed by a fire, resulting in the loss of such inventory and fixtures as were in the building.

After the conflagration, McDonald told J. Bradley Kline of Allstate and Lon Dyer of Farm Bureau he had no insurance coverage other than with their respective companies. When interviewed by Jack Malicky, an investigator for the Nebraska State Fire Marshal's office, McDonald said "he had no insurance on any of the contents nor would he have insurance on the structure." Later, McDonald told Malicky that his current wife had "found two insurance policies at his residence," one issued by Farm Bureau and the other by Allstate.

According to Kline, when McDonald reported the fire, his

demeanor "was very calm. He acted like it was just no big deal." McDonald represented to Kline that there was no other insurance on the building and asked Kline to delay reporting or filing the claim with the claims office.

McDonald's former wife, Janice Maxwell, testified that about 3 weeks before the fire, McDonald owed her approximately $10,000 in past-due child support payments. According to McDonald, his total indebtedness at the time of the fire was approximately $130,000. Furthermore, a number of finance-related lawsuits were pending against him. Additionally, McDonald had drawn a number of insufficient-fund checks on three separate accounts. McDonald was also in arrears on the lease payments due Lynch and had been asked by Lynch to quit the premises. Yet, when Malicky asked McDonald about his financial status, McDonald advised that "there was [sic] some bills to be paid on some of the contents but they were small bills."

About 3 weeks before the fire, McDonald had tried to sell Maxwell his business for $1 "to take care of the child support that he owed." According to Maxwell, McDonald "said he thought it would be a good idea for [her] to do it because it might be a good opportunity because something was going to happen to the business." Additionally, McDonald "mentioned insurance" and said he did not want Maxwell to "know what he was talking about."

Lori Myers, McDonald's employee, testified that when she left work on Friday, April 4, two three-drawer file cabinets and a typewriter were in the office, and that basic office supplies were in the drawers of two desks which were also in the office. However, Malicky testified that when he looked in the desk drawers after the fire, he could find "no type of paper or paperclips or pens or pencils or anything in there," not even ashes. Malicky's testimony in this regard was corroborated by another State Fire Marshal investigator, Brad Hoppe, and also by Robert O'Halleran, Allied's claim manager, and Ken Kempenaar, Allied's investigations supervisor. Furthermore, no charred remains of a typewriter or of a three-drawer file cabinet were found.

On the Saturday preceding the fire, April 5, a neighbor saw

two pickup trucks in front of the building, loaded with "some cardboard boxes." A search, made after the fire, of the house and farm McDonald's present wife owns and which she and he occupy disclosed the presence of more than 50 boxes marked D & D Supply. Some contained a variety of office supplies, part of which bore D & D Supply's designation. Also found were statements directed to D & D and a file labeled D & D insurance. The search also disclosed the presence of two tire machines, an air compressor, and a trailer full of new merchandise which included starters, tires, air filters, oil filters, solvents, and miscellaneous automobile parts. However, Doug Oltman, who rented land and buildings from McDonald's present wife, testified he had stored an air compressor, a tire machine, tools, and other supplies in a trailer at the farm occupied by the McDonalds.

Malicky and Hoppe considered the fire unusual or suspicious in nature. Malicky testified he made an inspection of the furnaces and found the lower floor furnace to have been "severely damaged by heat." This was suspicious "[b]ecause fire rises and it was unusual to find the overhead furnace to be in a fairly decent condition as compared to the lower furnace. When fire burns, fire burns up side down . . . . The heat should have [risen] instead of lowered." Malicky said he "would have expected the damage to be just the opposite of what [he] found." Malicky opined that "the first explosion that occurred in the parts building would have been from liquid propane" which came through "the liquid propane gasline," more than likely "through the furnace area."

Hoppe corroborated Malicky's testimony, saying that

> [f]ire burns upside down and so does the heat. The heat goes up to the sides if it can't escape and slowly works down to the floor.
>
> . . . .
>
> When you have high heats that [are] doing the damage at the floor level, something is keeping the heat burning at a high intense heat at the floor level which is unusual. . . .
>
> . . . .
>
> . . . You should have two-thirds more damage at the ceiling than you do at the floor.

Kempenaar found spalling ("popping, flaking off and breaking" of concrete flooring which can indicate the use of flammable liquid, accelerant, or gasoline) on the floor in the office portion of the building. He detected the odor of a fuel oil but did not observe any means of communication between any of the oil stored in the building and the spall in the office. Finally, he found a diesel fuel barrel with a missing cap in the building; however, the threads onto which the cap screwed were not damaged, indicating the cap had not blown off in an explosion. As a result of these findings, Kempenaar concluded that some product was used to cause an explosion, that "a flammable liquid was trailed throughout the structure to aid in the spread of the fire after" the explosion, and that the fire was "incendiary in origin," having been "intentionally set."

McDonald presented no expert opinion concerning the fire but established he was home in Firth, Nebraska, the day and evening before the fire and was in bed at the time of the fire. While the operator of a business near the premises in question reported that at approximately 1:35 on the morning of the fire he saw an automobile parked outside the burned premises, the record establishes no connection between this automobile and McDonald.

## EVIDENCE SUFFICIENT

The first assignment of error challenges the sufficiency of the evidence to support the convictions. In that connection McDonald correctly observes that in order to sustain an arson conviction, the State must prove beyond a reasonable doubt both that the property in question was burned and that it burned as the result of the accused's criminal act. *State v. Workman*, 213 Neb. 479, 329 N.W.2d 571 (1983); *State v. Keeton*, 199 Neb. 405, 259 N.W.2d 277 (1977). He also correctly observes that the mere fact that property was burned and that the origin of the fire is unknown does not constitute evidence that the fire was the result of a criminal act. *State v. Workman, supra.* Indeed, there is a presumption that a fire is not of criminal origin. Moreover, evidence of motive alone is not sufficient to sustain a conviction. *State v. Workman, supra.*

Before moving on to a consideration of whether the evidence establishes the elements of arson, we recall that a verdict in a

criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Bewley*, 229 Neb. 293, 426 N.W.2d 286 (1988). Moreover, in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. *State v. Anderson*, 229 Neb. 427, 427 N.W.2d 764 (1988). See, also, *State v. Bewley, supra.*

As to the arson conviction, there is more than ample direct evidence to establish that the property in question burned. Therefore, the crucial question becomes whether the evidence, evaluated in light of the rules set forth above, supports the finding inherent in the verdict that the property burned as the result of McDonald's criminal act. Again, there is competent evidence that the fire was set intentionally. Thus, the question refines itself into whether the evidence supports the further inherent finding that McDonald set or caused the fire to be set. There is no question that McDonald had access to the building and the contents which burned; he leased the building and owned, or at least had control over, the contents. The evidence further supports a finding that he had a motive. He was in financial difficulty, had procured two policies insuring the inventory and fixtures he owned or controlled, and had attempted to procure a third policy. Moreover, the comments he made to his former wife were such as to justify a finding that he contemplated arson as a means of solving his financial problems. The trucks seen loaded with boxes such as were later found at his home containing items of his business inventory and office supplies, together with the insurance file, combined with his motive and other circumstances, justify a finding that he knew a fire was about to consume whatever was in the building and that he wanted to preserve some inventory and supplies and have proof of insurance.

It is true that all of the foregoing evidence is circumstantial in nature, but circumstantial evidence is sufficient to support a conviction if such evidence and the reasonable inferences that may be drawn therefrom establish guilt beyond a reasonable

doubt. *State v. Anderson, supra.* In such a case the State is not required to disprove every hypothesis but that of guilt. *State v. Reed*, 228 Neb. 645, 423 N.W.2d 777 (1988); *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).

McDonald's reliance on *State v. Workman, supra,* in arguing that the evidence is insufficient to sustain his conviction for arson, is misplaced. The *Workman* holding that the trial court should have sustained Workman's motion for a directed verdict at the close of the State's case rests on the fact that the State had utterly failed to connect Workman to the fire at his brother's unoccupied house; the only evidence which in any way related to Workman was that an automobile registered to him was seen near the burned premises shortly before the fire. That is not the situation in this case. McDonald is tied to the fire by the numerous circumstances detailed earlier; those circumstances are sufficient to support the verdict finding McDonald guilty of arson.

Under the facts of this case, that determination necessarily means that the evidence is sufficient to support the verdict finding him guilty of burning with the intent to defraud an insurer. Thus, we must conclude that the first assignment of error is without merit.

## INSTRUCTION PROPER

McDonald claims in the second assignment of error that he was, in any event, prejudiced by the trial judge's error in instructing the jury. He urges there was no evidence to support the instruction that in order to find McDonald guilty, the State need not prove McDonald himself committed the unlawful acts in question. In summary, and to the extent relevant, the jury was told it was sufficient for the State to prove beyond a reasonable doubt that he aided and abetted others to so do by having (1) engaged others to commit the unlawful acts, (2) engaged with others in common, concerted unlawful acts, or (3) incited or encouraged others to commit the unlawful acts. McDonald maintains that not only is there no evidence persons other than he were involved, but the instruction assumed the fire was set intentionally and further relieved the State of the burden to establish that McDonald had the opportunity to set the fire, as the State needed only to convince the jury he aided

and abetted another.

However, it is not error to give an aiding and abetting instruction where the evidence indicates that a second person might be involved. *State v. Garza*, 193 Neb. 283, 226 N.W.2d 768 (1975). Contrary to McDonald's contention, there is, as established by our earlier analysis, evidence from which the jury might reasonably infer that McDonald attempted to provide himself with an alibi by being away from the premises at the time of the fire and caused the fire to be set through another. The fact that two pickup trucks were seen loaded with boxes such as were later found at McDonald's home supports an inference, should the jury choose to draw it, that some other person was involved. The fact that one of the insurance policies was placed in the name of McDonald's son does likewise, as does McDonald's statement to his former wife that something was going to happen to his business and that he did not want her to know what he was talking about.

McDonald's contention that the aiding and abetting instruction assumed the fire was set intentionally is equally without factual foundation. Quite the contrary, it requires the jury to find beyond a reasonable doubt that there was an unlawful act.

It is of course true, as McDonald contends, that the questioned instruction made it unnecessary for the State to prove McDonald himself had the opportunity to set the fire. That fact, however, does not make the instruction faulty; the legal principle involved is that one who participates with another in committing an unlawful act is as responsible for the act as the one who actually performs it. See *State v. Schreck*, 224 Neb. 650, 399 N.W.2d 830 (1987). Thus, the second assignment of error is also meritless.

## MISCONDUCT NOT PREJUDICIAL

This brings us to the question as to whether there was, as McDonald urges in the third and last assignment of error, such jury misconduct as requires a reversal of his convictions.

There is evidence that, contrary to the trial judge's repeated admonitions to the jurors not to discuss the case among themselves until finally submitted, two jurors did so during a time when the jury was assembled in the courtroom and the trial

judge and counsel were occupied in chambers. During the course of the hearing on McDonald's motion for new trial, defense trial counsel's wife testified she overheard two jurors discuss the location of the capless barrel and the spalling. What exactly the two jurors said to each other is not reflected by the record, but McDonald points out that this evidence was crucial to the foundation of Kempenaar's opinion that the fire had been set intentionally.

McDonald recognizes that in order for jury misconduct to form the basis for a new trial, it must have prejudiced the defendant. *State v. Rust,* 223 Neb. 150, 388 N.W.2d 483 (1986), *cert. denied* 481 U.S. 1042, 107 S. Ct. 1987, 95 L. Ed. 2d 826 (1987). See, also, *State v. West,* 217 Neb. 389, 350 N.W.2d 512 (1984); *State v. Steinmark,* 201 Neb. 200, 266 N.W.2d 751 (1978); *State v. Isley,* 195 Neb. 539, 239 N.W.2d 262 (1976). We have ruled that in a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome. See, *State v. Polinski, ante* p. 43, 429 N.W.2d 725 (1988); *State v. LeBron,* 217 Neb. 452, 349 N.W.2d 918 (1984); *Simants v. State,* 202 Neb. 828, 277 N.W.2d 217 (1979). However, where the jury misconduct in such a case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. See, *State v. West, supra* (burden placed on defendant to show that reading of news article by certain jurors prejudiced him); *State v. Woodward,* 210 Neb. 740, 316 N.W.2d 759 (1982) (burden placed on defendant to show certain jurors' unauthorized view of crime scene resulted in prejudice to him). Accord *Phillips v. State,* 157 Neb. 419, 59 N.W.2d 598 (1953).

While McDonald does not question that he bears the burden of proof, he, relying on *State v. Steinmark, supra,* contends that the hearing afforded him by the trial judge was inadequate. Steinmark was retried on charges that he unlawfully delivered controlled substances, for which he had already served a year in prison. At the hearing on his motion for new trial, the court received the affidavit of a juror which declared that during deliberations, one of the jurors said Steinmark had previously been convicted and served a year in prison for the same

offenses; another juror mentioned he had heard that the bar at which Steinmark worked " 'was a place . . . where illegal drugs were readily available for purchase,' " 201 Neb. at 203, 266 N.W.2d at 753; and several jurors said that the presence of Steinmark's name on the evidence tags attached to the drugs was evidence the drugs had been obtained from him. The State presented no evidence. In vacating the denial of a new trial and remanding the cause for further proceedings, this court said the matters alleged in the affidavit were a sufficient showing in support of the allegations of misconduct as to warrant an evidential hearing to determine whether misconduct occurred and whether it was prejudicial to the extent Steinmark was denied a fair trial. Based upon *United States v. McKinney*, 429 F.2d 1019 (5th Cir. 1970), the *Steinmark* court said at 204-05, 266 N.W.2d at 754:

> When an allegation of misconduct is made, and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur, or that it was not prejudicial, adequate findings should be made so that the determination may be reviewed.
>
> The matter of whether the misconduct occurred is largely a question of fact and the jurors may be questioned as to what happened during their deliberations. The determination as to whether the misconduct was prejudicial to the extent that the defendant was denied a fair trial is a question for the trial court which is to be resolved upon the basis of an independent evaluation of all the circumstances in the case.

The *Steinmark* court also noted that under the provisions of Neb. Rev. Stat. § 27-606(2) (Reissue 1975), now found at § 27-606(2) (Reissue 1985), a juror might testify as to "whether 'extraneous prejudicial information was improperly brought to the jury's attention.' No evidence may be received as to the effect of any statement upon a juror's mind, its influence one

way or another, or the mental processes of a juror in connection therewith." *Steinmark, supra* at 204, 266 N.W.2d at 754. Accord *State v. Roberts,* 227 Neb. 489, 418 N.W.2d 246 (1988).

There is nothing in *Steinmark* which suggests that the evidential hearing required cannot be conducted as a part of a hearing on a motion for new trial, as was done in this case. Unlike the situation in *Steinmark,* wherein the allegations of jury misconduct were "resolved in a summary manner," 201 Neb. at 205, 266 N.W.2d at 754, McDonald was permitted to adduce such evidence as he had developed. The trial judge then stated on the record: "[E]ven if we assume that there was juror misconduct, which certainly the evidence falls far short of showing that, there is absolutely no evidence that the — that this alleged misconduct was prejudicial to [McDonald]."

The trial judge's suggestion that the premature discussions fall "far short" of establishing misconduct is incorrect; the offending jurors' violation of the admonitions they were given did indeed constitute misconduct. However, the trial judge's determination that there was no prejudice to McDonald is adequate, under the circumstances of this case, to enable us to review the basis on which the trial judge concluded that the misconduct did not warrant a new trial.

In making that review, we are guided by *State v. Isley,* 195 Neb. 539, 239 N.W.2d 262 (1976), which involved a situation remarkably similar to that presented by the present case. The evidence in *Isley* showed that during the course of trial, the jurors had discussed the witnesses during recesses and expressed opinions relating to their credibility and the conflicts in the testimony, all against the judge's admonishings. This court said that if such discussions did take place, it was misconduct, but held that because no prejudice to the defendant was shown, his motion for new trial was properly denied, as there was "no indication that any of the jurors had made up their minds as to the defendant's guilt or innocence prior to the conclusion of the trial." *Id.* at 541-42, 239 N.W.2d at 265.

There being no evidence that the misconduct resulted in any juror making up his or her mind as to McDonald's guilt or innocence prior to the completion of the trial, we cannot say the trial judge's finding a lack of prejudice is erroneous. Thus, the

last assignment of error is as devoid of merit as were the first two.

## DECISION

That being so, the judgment of the trial court must be, and hereby is, affirmed.

AFFIRMED.