Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/09/2018 08:11 AM CST

State of Nebraska, appellee, v.
Shanna E. Golyar, appellant.
___ N.W.2d ___

Filed November 9, 2018.    No. S-17-955.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

3. **Homicide: Intent.** A person commits first degree murder if he or she kills another person purposely and with deliberate and premeditated malice.

4. **Criminal Law: Homicide: Proof: Words and Phrases.** In a homicide case, corpus delicti is the body or substance of the crime—the fact that a crime has been committed. It is not established until it is proved that a human being is dead and that the death occurred as a result of the criminal agency of another.

5. **Homicide: Circumstantial Evidence: Proof.** The body of a missing person is not required to prove the corpus delicti for homicide. Instead,

courts have generally held that circumstantial evidence associated with the victim's disappearance can be sufficient to establish the death.

6. **Homicide: Intent: Circumstantial Evidence: Proof.** Purposeful, deliberate, premeditated murder may be proved circumstantially.

7. **Homicide: Intent: Words and Phrases.** In the homicide context, deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act.

8. ____: ____: ____. The term "premeditated" means to have formed a design to commit an act before it was done.

9. **Homicide: Intent.** One kills with premeditated malice if, before the act causing death occurs, one has formed the intent or determined to kill the victim without legal justification.

10. **Homicide: Intent: Time.** No particular length of time for premeditation is required, provided the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.

11. ____: ____: ____. The design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.

12. **Criminal Law: Evidence: Intent.** The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.

13. **Arson.** A person commits arson in the second degree if he or she intentionally damages a building or property contained within a building by starting a fire or causing an explosion.

14. **Arson: Circumstantial Evidence: Proof.** Circumstantial evidence is sufficient to support a conviction for arson if such evidence and the reasonable inferences that may be drawn therefrom establish guilt beyond a reasonable doubt.

15. **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

16. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

17. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does

not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

18. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

19. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

20. **Effectiveness of Counsel: Jury Trials: Waiver.** The decision to waive a jury trial is ultimately and solely the defendant's, and, therefore, the defendant must bear the responsibility for that decision.

21. ____: ____: ____. Counsel's advice to waive a jury trial can be the source of a valid claim of ineffective assistance only when (1) counsel interferes with the client's freedom to decide to waive a jury trial or (2) the client can point to specific advice of counsel so unreasonable as to vitiate the knowing and intelligent waiver of the right.

22. **Trial: Joinder.** Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.

23. **Trial: Constitutional Law: Testimony.** A defendant has a fundamental constitutional right to testify.

24. **Trial: Attorney and Client: Testimony: Waiver.** The right to testify is personal to the defendant and cannot be waived by defense counsel's acting alone.

25. **Trial: Attorney and Client: Testimony.** Defense counsel bears the primary responsibility for advising a defendant of his or her right to testify or not to testify, of the strategic implications of each choice, and that the choice is ultimately for the defendant to make.

26. **Trial: Attorney and Client: Effectiveness of Counsel: Testimony: Waiver.** Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Lori A. Hoetger, and Scott C. Sladek for appellant.

Douglas J. Peterson, Attorney General, Sarah E. Marfisi, and Erin E. Tangeman for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Moore, Chief Judge.

Stacy, J.

Cari Farver disappeared on November 13, 2012, and her body has never been found. About 4 years after Farver's disappearance, Shanna E. Golyar was charged with Farver's murder and with arson. At trial, the State introduced uncontested evidence that Golyar considered Farver a romantic rival and that Golyar posed as Farver (and others) for several years in emails, texts, and on social media. While posing as someone else, Golyar confessed in several emails to murdering Farver.

Golyar was found guilty of first degree murder and second degree arson after a bench trial. She was sentenced to life imprisonment on the murder conviction and to a consecutive sentence of 18 to 20 years' imprisonment on the arson conviction. In this direct appeal, Golyar contends the evidence was insufficient to support the convictions and claims her trial counsel was ineffective in various ways. We affirm.

## I. FACTS

### 1. Golyar Meets David Kroupa

In late spring or early summer 2012, Golyar started dating David Kroupa after meeting him through an online dating site. Kroupa described the relationship as "[c]asual" and informed Golyar he was also dating other women. From almost the beginning, however, Golyar wanted a commitment from Kroupa. The State's general theory was that Golyar was obsessed with Kroupa and did not want him dating other women.

### 2. Kroupa Meets Farver

Near the end of October 2012, Kroupa met the victim in this case, Farver. Kroupa's first date with Farver was on October 29 at a restaurant in Omaha, Nebraska. During the date, Kroupa's

cell phone began "blowing up" with calls and text messages from Golyar. He initially ignored the messages, but when they continued, he contacted Golyar and told her he was on a date and could not respond. When they left the restaurant, Kroupa and Farver went to Kroupa's nearby apartment.

Almost immediately after they arrived, Golyar started ringing the bell at the security door of Kroupa's apartment building. Kroupa left Farver in his apartment and went to the security door to speak with Golyar. Golyar was crying and upset and insisted Kroupa let her in so she could retrieve some of her belongings from his apartment. Kroupa left Golyar at the security door and went back to his apartment to explain the situation to Farver. Farver decided to leave, and as she did so, she passed by Golyar, who was still standing by the security door. Farver got into her black Ford Explorer, which was parked near the security door, and drove away.

After Farver left, Kroupa let Golyar into his apartment to retrieve her belongings. She was still upset and did not stay long before he asked her to leave. Not long after Golyar left, Kroupa and Farver spoke on the telephone and Kroupa then traveled to Farver's home in Macedonia, Iowa, where he spent the night.

Kroupa and Farver continued to see a lot of each other over the next several weeks. Kroupa also continued to see Golyar during this time period. On November 9 or 10, 2012, Farver's Explorer was vandalized with spray paint while parked in Macedonia. Investigators subsequently learned that Golyar, via a Facebook account she had created under a false persona, claimed to be in Macedonia during that time period. That imposter Facebook account had also attempted to "friend" Farver.

Farver worked in Omaha at a business not far from Kroupa's apartment. Starting Monday, November 12, 2012, she was beginning a weeklong project at work that would require her to work late hours. Farver arranged for her teenage son to stay with her mother and stepfather during that week, and Kroupa agreed Farver could spend the week with him at his apartment. Farver went to work as planned on Monday, November 12,

and left work between 8 and 9 p.m. Her coworkers expected her at work the next morning. Farver spent the night with Kroupa at his apartment.

Kroupa left for work on November 13, 2012, at approximately 6:20 a.m. At that time, Farver was awake and using her laptop computer. No one has seen Farver since.

### 3. Farver's Cell Phone, Debit Card, and Facebook Account

Records from Farver's employer showed she called in on the work project at 6:15 a.m. on November 13, 2012. Other records showed Farver logged into her Facebook account from Kroupa's apartment at 6:39 a.m. and logged out at 6:42 a.m.

At 9:54 a.m., Farver's Facebook account "unfriended" Kroupa. At 10 a.m., Kroupa received a text from Farver's cell phone asking him if he wanted to live together. This surprised him, as he thought Farver agreed they were only involved in a casual relationship, and he responded, "No." Twenty seconds later, he received an angry text from Farver's cell phone breaking off the relationship.

Also on November 13, 2012, Farver's cell phone texted Farver's mother. The text said Farver had found a new job, which surprised her mother. Farver's mother texted back over the course of the next several days and asked questions, including when Farver was coming to pick up her son for an upcoming family wedding, but received no response. This was unusual because Farver and her mother typically had daily contact. Farver's mother reported her daughter missing on Friday, November 16.

On November 15, 2012, Farver's employer received a text from her cell phone, stating that she was resigning and was sending "Shanna Golyar" to replace her. Later that day, Golyar filled out an online application with the employer. On November 16, Farver's debit card was used to make purchases of $167.78 and $226.56 at two separate discount stores in Omaha. An item purchased at one of the stores was a shower curtain with a distinctive black-and-white floral pattern.

On November 17, 2012, Farver's mother received another text from Farver's cell phone. It included a photograph of a check for $5,000 made out to Farver and signed by Golyar, and asked Farver's mother to let Golyar into Farver's home to retrieve a bedroom set Golyar had allegedly purchased via the check. Farver's mother was suspicious about the text and contacted police. Police had Farver's service provider "ping" her cell phone to attempt to locate it, and the ping showed that in the early hours of November 18, the cell phone was at an Omaha location not far from Golyar's residence. Police searched for Farver's cell phone, but it was never found.

Farver's Facebook account continued to be active after November 13, 2012, making posts and sending messages. Trial evidence demonstrated, however, that the account making the posts and sending the messages was actually an imposter account, created using photographs and information available on Farver's actual Facebook account. The imposter account making those posts was linked via digital evidence to Golyar. This imposter account attempted to contact both Farver's mother and Farver's teenage son. Photographs from Farver's original Facebook account were also used by Golyar to make online dating profiles in Farver's name.

### 4. HARASSMENT OF GOLYAR AND KROUPA

Beginning in November 2012 and continuing until approximately December 2015, both Golyar and Kroupa began receiving frequent harassing texts and emails, purportedly from Farver. The texts came from as many as 30 different telephone numbers. The emails came from as many as 30 different email accounts. Kroupa alone received 50 to 60 such emails per day, in addition to frequent texts and missed telephone calls. The texts and emails frequently referred to Golyar as a "whore."

Golyar reported vandalism to her property, allegedly by Farver, on November 23, 2012, and February 12 and April 1, 2013. Golyar also reported someone had broken into her garage prior to November 23, 2012, and stolen checks

from her. Kroupa reported vandalism to his property in July, October, and December 2013. Many of these acts of vandalism involved messages referring to Golyar as a "whore." Each time an act of vandalism occurred, Kroupa, Golyar, or both would receive a text or email from "Farver" taking responsibility for the act. The acts of vandalism tended to occur at times when Kroupa was becoming less interested in Golyar, and the two were drawn back together by their mutual fear or dislike of Farver.

In January 2013, with Kroupa's consent, the police downloaded information from his cell phone to obtain data related to the texts and emails purportedly sent by Farver. At the same time, with Golyar's consent, police also downloaded similar information from her cell phone. The downloads were "logical" downloads, which did not include data previously deleted from the devices.

## 5. TODD BUTTERBAUGH

Todd Butterbaugh met Golyar in September 2010 through an online dating site, and they dated until September 2015. Butterbaugh understood the relationship was exclusive. During the course of that relationship, Butterbaugh helped Golyar with her bills, helped her buy a car, let her move into his residence with her two children, and cared for her children.

In January 2013, Butterbaugh began receiving text and email messages, purportedly from Farver. In those messages, "Farver" explained she was one of Golyar's friends and Golyar had given her Butterbaugh's contact information in case "Farver" ever needed an emergency contact for Golyar. When Butterbaugh asked Golyar about the messages, she confirmed this and said Farver was her friend. In general, the texts and emails between "Farver" and Butterbaugh discussed Butterbaugh's relationship with Golyar. Butterbaugh did not learn of Kroupa until Golyar's cell phone was downloaded by the police. At that time, Golyar told Butterbaugh she had dated Kroupa before she met Butterbaugh and that they had remained friends.

Golyar and her two children moved in with Butterbaugh in July 2013 and stayed until December 2015 or January 2016. During the time she dated and lived with Butterbaugh, Golyar did not tell him she was being harassed by Farver or anyone else. While staying with Butterbaugh, Golyar had access to his Wi-Fi network and several electronic devices, including a laptop and an iPod. Golyar and Butterbaugh broke up in October 2015.

### 6. August 17, 2013, Fire

Golyar and Kroupa broke off their relationship in early August 2013. Shortly thereafter, on Saturday, August 17, at 8:14 a.m., a fire was reported at a residence Golyar rented in Omaha. Golyar told investigators she and her children had left the residence at 3 p.m. the day before, and she had returned at approximately 7:30 a.m. the following day and discovered the fire. She told investigators she was in the process of moving from the residence, but they later learned she had been evicted. Firefighters found smoke in the home, but the fire had cooled and was no longer hot. Golyar's four pets died in the fire.

Investigators discovered at least six different points of origin of the fire and found accelerants. They quickly determined the fire had been set intentionally.

Golyar and Kroupa both received emails, purportedly from Farver, claiming responsibility for the fire. The email to Golyar was sent at 12:56 a.m. on August 17, 2013, and said "Farver" hoped Golyar and her children burned to death. The email to Kroupa was sent at 11:57 p.m. on August 16 and said, "I am not lying I set that nasty whores house on fire I hope the whore and her kids die in it." Golyar and Kroupa got back together after the fire.

### 7. Amy Flora and December 5, 2015, Shooting

Before Kroupa met Golyar and Farver, he had a long-term relationship with Amy Flora and they had two children together. Flora and Kroupa remained amicable after their breakup. Flora

and the children lived in Omaha, and Golyar met Flora briefly when she accompanied Kroupa to pick up his children for parenting time. In 2013, Flora began receiving harassing Facebook and text messages purportedly from Farver. Some of the messages indicated Flora was being watched.

Golyar and Kroupa broke up again in mid-November 2015, because Kroupa decided to have a "more serious" relationship with another woman. Shortly thereafter, on Friday, December 4, Golyar told police that Flora had been sending her harassing messages via Facebook and text. Golyar told police that she now suspected it was Flora, not Farver, who had been harassing her and Kroupa all along. Golyar consented to a download of her cell phone so police could review the harassing messages. After the download, the investigating officer told Golyar he would follow up with Flora on Monday.

On Saturday morning, Golyar sent the officer additional harassing messages she claimed were sent to her by Flora. Later that day, at 6:40 p.m., officers were dispatched to a park located in a wilderness area in Council Bluffs, Iowa. They found Golyar sitting on the ground near the driver's side of the only car in the parking lot. Golyar had been shot in the left thigh. Golyar's accounts of how the shooting occurred varied significantly over the course of the next several days and weeks, but she insisted Flora had shot her.

Based on Golyar's statements at the scene, police went to Flora's home. Flora testified that she answered her door to find "police standing at [her] door with guns pointed at [her]." Flora had been home with her 2-year-old son, and officers noticed her car was cold to the touch, indicating it had not been used recently. Police questioned Flora and found her cooperative.

Police obtained consent from both Flora and Kroupa to download their cell phones on Monday, December 7, 2015. The download from Kroupa's cell phone showed many of the emails he received from "Farver" were sent from Butterbaugh's internet protocol (IP) address while Golyar was living with

Butterbaugh. A digital forensic expert explained that an IP address is like a postal address for an electronic device and that it references a device's access to the internet from a fixed location. He testified that if a device accessed a residence's Wi-Fi, the IP address will be that residence.

In late January or early February 2016, Kroupa moved in with Flora over a weekend. The following week, Golyar contacted police, very upset that Flora had not been charged in relation to the shooting. Golyar again consented to a download of her cell phone after telling police she had received additional harassing emails from "Flora." At this time, police generally told Golyar that they suspected Flora in the shooting, but needed additional information to charge her. This was untrue, because by this time, police suspected Golyar had shot herself.

Golyar then began receiving additional emails from "Flora" about Farver's murder. These emails are dated between December 21, 2015, and February 24, 2016. Several of the emails confessed to the murder of Farver and the arson of Golyar's residence, and at least one confessed to the shooting of Golyar. The emails confessing to killing Farver gave details of how the murder occurred. The emails contained various and sometimes inconsistent details about the murder, but consistently described that Farver was stabbed in her vehicle, her body was wrapped in a tarp then later burned and put in the garbage, her vehicle was cleaned afterward, the killer posed as Farver after the killing, and the killer went to Farver's home after the killing. One email describes the interior of Farver's home with precision.

### 8. FARVER'S EXPLORER AND OTHER EVIDENCE

The January 8, 2013, download from Golyar's cell phone showed the cell phone had made six calls to Farver's landline on November 6 and 7, 2012, just days before Farver disappeared. Also discovered in the download of Golyar's cell phone was a photograph of Farver's Ford Explorer. Metadata

showed the photograph was taken December 24, 2012. This date was after Farver disappeared on November 13 and before her Explorer was found parked near Kroupa's apartment in January 2013. The download of Golyar's cell phone also included a video that was uploaded to YouTube, a video-sharing website, by "Farver." The video showed an apartment complex that looked like Kroupa's. The IP address used to access the YouTube account was Butterbaugh's. The YouTube account was created in 2014, after Farver's disappearance.

When Farver's Explorer was initially discovered in Omaha in January 2013, it was examined by a crime scene techni-cian. At the time, the technician was primarily looking for fingerprints and noticed the vehicle was very clean. The only fingerprints found were on a mint container in the center cup-holder. In September 2015, investigators learned the finger-prints were Golyar's.

On December 8, 2015, the Explorer was processed again by the same technician. This time she was looking for blood, but found none. On February 18, 2016, the technician processed the vehicle a third time. This time, she removed the cloth seat covers and found a large red stain on the passenger side seat foam. DNA testing showed it was Farver's blood.

## 9. SEARCH WARRANTS

In February 2016, investigators obtained warrants and searched the apartment where Golyar was living, as well as the residence where she had lived with Butterbaugh. The storage unit where Farver's mother had moved Farver's belongings was searched in March 2016.

Various items were found at Golyar's apartment, including LG cell phones; a black-and-white floral shower curtain that matched the description of the one purchased at the discount store with Farver's debit card on November 16, 2012; a red Sony video camcorder; a Nikon Coolpix digital camera; and memory cards. Owners' manuals for the Nikon camera and the red Sony camcorder were found among Farver's belongings during the search of the storage unit, along with receipts from

a furniture store showing Farver had purchased both items in October 2012.

### 10. Evidence Linked Golyar to "Farver" and "Flora" Emails

Police also obtained search warrants for a large number of email accounts, including 31 from Google, 9 from Yahoo!, and 5 from Microsoft. A digital forensic examiner gave detailed testimony linking Golyar to all relevant messages sent by "Farver" after her disappearance from these accounts based on IP address and device usage. The forensic examiner explained that when using these "imposter" accounts, Golyar often attempted to hide her identity by using services that either disguised her IP address and/or sent messages at times other than when they were composed. The forensic examiner also gave detailed testimony linking Golyar to all relevant messages sent by "Flora" from these accounts based on IP address and device usage. At trial, Golyar did not contest the forensic evidence linking her to these imposter accounts. Similarly, on appeal, Golyar does not contest that the State proved the emails from "Farver" and "Flora" were actually authored by Golyar.

### 11. Evidence Relating to Farver's Body

In one of the emails confessing to the murder, "Flora" described a "yin-yang" tattoo on Farver's left hip. This tattoo had never been described to the public. Police located Farver's ex-husband and learned that when the two married in 2009, they got matching yin-yang tattoos. Farver's ex-husband's tattoo was on his calf, and Farver's was on her left hip. Police also obtained a photograph of Farver from her mother which showed a tattoo of the Chinese symbol for mother on the top of Farver's left foot.

In February 2017, investigators recovered a tablet computer from Kroupa that had been accessible to Golyar while the two were dating. The tablet had a memory card known as a micro SD card inserted into it. The forensic digital examiner found

no existing files on the SD card, but was able to recover many deleted ones. These included over 13,000 photographs and numerous text messages sent either to or from Golyar.

The tablet did not have text capabilities, so the examiner realized the SD card must have been used with another device at one time. He discovered that Golyar's "LG VS920" cell phone, the contents of which were downloaded by police on January 8, 2013, was compatible with the SD card. The login file for Golyar's cell phone showed it had used the SD card. And 458 of the 13,000 photographs on the card were also on Golyar's cell phone when it was downloaded.

Several of the photographs on the SD card were images of what appears to be a blue and grey or silver tarp, taken from various angles. Another photograph depicts a flesh-colored object with a yin-yang symbol on it. A forensic video analyst compared the yin-yang symbol in this photograph to an image of the yin-yang symbol on Farver's ex-husband's calf and concluded they were very consistent with each other. Another photograph depicts a flesh-colored object with a Chinese symbol on it. The video analyst compared the symbol in this photograph to the image of the tattoo on Farver's left foot provided by Farver's mother, and concluded the images were also very consistent with one another.

A forensic pathologist testified that the photograph depicting the Chinese symbol was a photograph of the top part of a human left foot. The pathologist opined that the foot showed signs of decomposition, but admitted she could not tell from the photograph how long the foot had been decomposing.

Golyar waived a jury trial, and she did not testify at the bench trial. After the State rested, Golyar moved for a "directed motion of acquittal," which the court overruled. The defense did not present any evidence. Golyar was convicted of one count of first degree murder and one count of second degree arson. She was sentenced to life imprisonment on the murder conviction and to 18 to 20 years' imprisonment on the arson conviction, the sentences to run consecutively. She appeals, represented by new counsel.

## II. ASSIGNMENTS OF ERROR

Golyar assigns and argues that the evidence at trial was insufficient to prove the elements of first degree murder and second degree arson. She also contends her trial counsel provided ineffective assistance by (1) not adequately advising her of her right to a jury trial, (2) failing to move to sever the charges against her, (3) failing to file any pretrial motions, (4) waiving objections to the vast majority of evidence introduced by the State, (5) failing to put on any sort of defense and/or investigate potential witnesses and alibis, (6) failing to call an expert to rebut the pathologist's testimony, (7) failing to adequately advise Golyar on her right to testify at trial, and (8) being so unprepared for trial and unfamiliar with the case that he referred to Golyar and Farver by the wrong names.

## III. STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

[2] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was

---

[1] *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo, ante* p. 185, 917 N.W.2d 865.

or was not prejudiced by a defense counsel's alleged deficient performance.[2]

## IV. ANALYSIS

### 1. Evidence Was Sufficient to Prove First Degree Murder

[3] Golyar argues the State's evidence was insufficient to show she committed first degree murder. In Nebraska, a person commits first degree murder if he or she kills another person purposely and with deliberate and premeditated malice.[3] The State concedes the elements of murder were proved with circumstantial evidence, but contends it met its burden of proving each element beyond a reasonable doubt. We agree.

### (a) Evidence of Death

[4,5] In a homicide case, corpus delicti is the body or substance of the crime—the fact that a crime has been committed.[4] It is not established until it is proved that a human being is dead and that the death occurred as a result of the criminal agency of another.[5] Here, Farver's body was never recovered. However, the body of a missing person is not required to prove the corpus delicti for homicide.[6] Instead, courts have generally held that circumstantial evidence associated with the victim's disappearance can be sufficient to establish the death.[7]

This court has specifically addressed such a situation. In *State v. Edwards*,[8] we found sufficient circumstantial evidence

---

[2] *Id.*

[3] Neb. Rev. Stat. § 28-303 (Supp. 2017).

[4] *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009).

[5] *Id.*

[6] *Id.*

[7] See *id.*

[8] *Id.*

of a victim's death even though her body was never recovered. *Edwards* relied in part on evidence that the victim abruptly severed her habits and relationships without explanation, abandoned her personal effects, and did not take any money from her bank account after her disappearance. *Edwards* also found other facts were suggestive of an unlawful killing, including that the victim's blood was found and the suspect had attempted to conceal the victim's disappearance.

Similar circumstantial evidence of Farver's death appears in the record. Farver has not been seen since November 13, 2012, when she abruptly ended her contacts with her teenage son, her parents, her employer, and her current boyfriend. Her money has not been accessed, aside from the use of her debit card on November 16, and that use has been linked to Golyar. Farver's blood was found in her vehicle. Overwhelming and uncontested evidence showed that Golyar posed as Farver online and in social media in an attempt to conceal Farver's disappearance.

In addition, the record before us contains additional circumstantial evidence of Farver's death. Photographs of what appear to be body parts with tattoos identical to Farver's tattoos were discovered on an SD card used with Golyar's cell phone. And, most importantly, a forensic pathologist testified that a photograph on the same SD card of a human left foot, which had a tattoo consistent with the one on Farver's left foot, showed signs the foot was in a state of decomposition.

We conclude a rational trier of fact, viewing the evidence in the light most favorable to the State, could have concluded the State proved beyond a reasonable doubt that Farver is dead.

### (b) Purposely, Deliberate, and Premeditated

Golyar argues that even if there was sufficient evidence to prove Farver's death, the "State did not introduce any evidence whatsoever to prove [Golyar] killed . . . Farver intentionally . . . and perhaps most significantly, the State's

evidence was insufficient to prove [Golyar] killed [Farver] with deliberate and premeditated malice."[9]

[6-12] Purposeful, deliberate, premeditated murder may be proved circumstantially.[10] In the homicide context, deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act.[11] The term "premeditated" means to have formed a design to commit an act before it was done.[12] One kills with premeditated malice if, before the act causing death occurs, one has formed the intent or determined to kill the victim without legal justification.[13] No particular length of time for premeditation is required, provided the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[14] The design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.[15] The intent with which an act is committed is a mental process and may be inferred form the words and acts of the defendant and from the circumstances surrounding the incident.[16]

A rational fact finder viewing the evidence in the light most favorable to the State could have found that Golyar was obsessed with Kroupa and thus had a motive to harm Farver. The record shows that just days before Farver's disappearance, Golyar made six telephone calls to Farver's landline and vandalized Farver's vehicle, suggesting a premeditated plan to harm Farver. Most significantly, however, the record contains the emails, authored by Golyar posing as Flora, confessing to

---

[9] Brief for appellant at 24.

[10] See *State v. Escamilla*, 291 Neb. 191, 864 N.W.2d 376 (2015).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] See *id.*

[16] See *State v. Sing*, 275 Neb. 391, 746 N.W.2d 690 (2008).

the details of the murder. A rational trier of fact could con-
clude these emails are Golyar's own statements describing the
manner of the murder, the motive for the murder, and her state
of mind in committing the murder.

The emails authored by Golyar contain considerable evi-
dence that Golyar killed Farver purposely and with deliberate
and premeditated malice. Some examples from those emails,
with spelling errors corrected, include:

> "I atta[c]ked her with a kn[i]fe I stabbed her three to
> four times in chest and stomach area. I t[h]en took her out
> and burned her."
>
> . . . .
>
> "I k[i]lled [Farver] because she . . . wouldn't leave
> [Kroupa] alone."
>
> . . . .
>
> "I even went out to [Farver's] place got some of
> [Farver's] clothes and other th[i]ngs to make it look like
> she ran away."

One email describes driving with Farver in Farver's vehicle,
and then stabbing Farver multiple times in the stomach. This
email states Farver was alive after the stabbing and "begging
for her life" while Golyar spent the "[w]hole t[i]me watch[i]ng
the life drain fr[o]m her body." Another email described the
yin-yang tattoo on Farver's left thigh in order to prove "I'm
not lying about offing that crazy bitch." Two of the emails
refer to covering Farver's body with a tarp.

Other evidence in the record corroborates some of the state-
ments made in these emails, including the presence of Farver's
blood in her vehicle, evidence of Golyar's obsession with
Kroupa, evidence that Golyar accessed Farver's home and took
some of her possessions, the existence of the yin-yang tattoo
on Farver's left hip, and the photographs of tarp found on the
SD card.

A rational fact finder viewing the evidence in the light
most favorable to the State could conclude the State proved
Golyar killed Farver purposely and with deliberate and pre-
meditated malice. There is no merit to Golyar's claim that the

evidence was insufficient to support her conviction for first degree murder.

## 2. Evidence Was Sufficient
### to Prove Arson

[13] Golyar also argues there was insufficient evidence to support her conviction for second degree arson. As relevant here, a person commits arson in the second degree if he or she intentionally damages a building or property contained within a building by starting a fire or causing an explosion.[17]

Here, the evidence clearly established that the August 17, 2013, fire at Golyar's residence was intentionally set, as investigators discovered multiple origin sources and evidence that accelerants were used. On appeal, Golyar argues only that there was not sufficient evidence to prove she was the arsonist and that any such evidence was circumstantial.

[14] It is true the evidence linking Golyar to the arson is circumstantial, but circumstantial evidence is sufficient to support a conviction for arson if such evidence and the reasonable inferences that may be drawn therefrom establish guilt beyond a reasonable doubt.[18] Viewing the evidence in the light most favorable to the State, a rational finder of fact could conclude the circumstantial evidence established Golyar was the arsonist.

There is no dispute Golyar had access to the property that was intentionally burned and had a motive to commit the arson. The arson was part of a pattern of vandalism purportedly committed by Farver but ultimately linked to Golyar via the uncontested digital forensic evidence. These acts of vandalism tended to occur at times when Kroupa was becoming less interested in Golyar and were designed to capitalize on a mutual fear of Farver and draw Kroupa back. Golyar and Kroupa had broken off their relationship just before the arson, and after the arson, they reunited. And, most significantly,

---

[17] See Neb. Rev. Stat. § 28-503 (Reissue 2016).

[18] *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988).

Golyar, posing as Flora, later confessed to committing the arson in two emails.

We conclude the circumstantial evidence and reasonable inferences therefrom were sufficient to support the arson conviction. Golyar's arguments to the contrary are without merit.

### 3. Ineffective Assistance of Counsel

[15] Golyar claims her trial counsel provided ineffective assistance in several respects. She is represented on direct appeal by different counsel than she had during trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[19]

[16,17] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[20] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[21] The determining factor is whether the record is sufficient to adequately review the question.[22]

[18,19] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[23] In reviewing claims of ineffective assistance of counsel

---

[19] See *State v. Loding*, 296 Neb. 670, 895 N.W.2d 669 (2017).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018); *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[24]

### (a) Waiver of Jury Trial

Golyar claims her trial counsel was ineffective in advising her to waive her right to a jury trial. The record shows she waived this right not once, but twice.

Golyar was originally charged with only first degree murder. At her arraignment, she entered a plea of not guilty and asked, on the record, to waive her right to a jury. The court advised her of the constitutional right to a jury trial and explained the consequences of waiving such right. Golyar stated that she understood, and wanted to waive her right to a jury and proceed with a bench trial. She told the court she had discussed her desire to waive a jury with her attorney, and she confirmed that no one had promised her anything or forced or threatened her in any way to get her to waive a jury trial.

The State subsequently amended the information to add the second degree arson charge. At her arraignment on the amended information, Golyar pled not guilty and again asked to waive a jury trial. The court again advised her on the record of her right to a jury trial and the consequences of waiving such right. Golyar again stated she understood and wished to waive a jury. She affirmatively stated that she had discussed her desire to waive a jury with her attorney and that no one had promised her anything or forced or threatened her in any way to get her to waive a jury trial.

[20,21] The decision to waive a jury trial is ultimately and solely the defendant's, and, therefore, the defendant must bear the responsibility for that decision.[25] Counsel's advice to waive a jury trial can be the source of a valid claim of ineffective

---

[24] *Id.*

[25] *State v. Golka*, 281 Neb. 360, 796 N.W.2d 198 (2001).

assistance only when (1) counsel interferes with the client's freedom to decide to waive a jury trial or (2) the client can point to specific advice of counsel so unreasonable as to vitiate the knowing and intelligent waiver of the right.[26]

On appeal, Golyar does not suggest her attorney interfered with her freedom to decide whether to waive a jury, but contends only that trial counsel "did not adequately advise [her] regarding her right to a jury trial."[27] It is clear from the record that she discussed the waiver with her counsel, but beyond characterizing counsel's advice on that issue as being inadequate, she offers no specifics about the advice counsel gave or why it was unreasonable. Golyar has thus failed to allege this claim of ineffective assistance with sufficient particularity. Moreover, because she concedes the court fully advised her of the right to a jury trial and the consequences of waiving that right, the record affirmatively refutes any showing of prejudice. This claim of ineffective assistance has no merit.

### (b) Motion to Sever

Golyar argues her trial counsel was ineffective for failing to move, prior to trial, to sever the arson charge from the murder charge. Pursuant to Neb. Rev. Stat. § 29-2002(1) (Reissue 2016):

> Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

And pursuant to § 29-2002(3), offenses properly joined under § 29-2002(1) may be tried separately if the court finds either the defendant or the State "would be prejudiced by a joinder."

---

[26] *Id.*

[27] Brief for appellant at 33.

Golyar argues both that the murder and arson charges were not properly joinable under § 29-2002(1) and that, even if they were, the joinder resulted in prejudice to her. She suggests that if her trial counsel had asked, the trial court would have ordered separate trials. We find the record is sufficient to review and reject this claim.

[22] The State's theory was that the arson was part of Golyar's common scheme or plan to cover up Farver's murder. As such, the charges were properly joined under § 29-2002(1). Had trial counsel moved to sever, Golyar would have had the burden to show compelling, specific, and actual prejudice from the joinder.[28] Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[29]

The record demonstrates that if the murder had been charged separately, evidence of the arson would have been admissible at that trial. The arson was part of Golyar's scheme both to cover up Farver's murder and to frame Flora for Farver's murder. There is no merit to this claim of ineffective assistance of trial counsel.

### (c) Pretrial Motions

Golyar argues her trial counsel was ineffective because he "failed to file *any* pretrial motions" and "failed to move to exclude any of the State's anticipated evidence."[30] Golyar offers no specifics about what pretrial motions should have been filed, or what evidence should have been excluded, other than to remark that counsel did not file a motion to exclude the photographs found on the memory card depicting flesh-colored objects with tattoos and the pathologist's testimony about decomposition.

But Golyar concedes, and the record confirms, that trial counsel made an oral motion to exclude the photograph

---

[28] *State v. Cotton, supra* note 1.

[29] See *id.*

[30] Brief for appellant at 35 (emphasis in original).

depicting what appears to be a foot with a yin-yang tattoo and the pathologist's testimony with respect to that photograph. In response, the court indicated it would make a determination on admissibility at the time of trial, after hearing foundational evidence. At trial, Golyar objected to the pathologist's opinion, arguing the pathologist could not testify with a reasonable degree of certainty that the photograph was of a decomposing foot. That objection was overruled. The pathologist then testified the changes in the skin and the coloring in the photograph were "comparable" or "'compatible with'" a decomposing human body.

The record thus refutes Golyar's claim that there was no request to exclude the photograph and the pathologist's testimony. And to the extent Golyar is attempting to raise claims that her trial counsel should have filed other pretrial motions or sought to exclude other evidence, we conclude Golyar has failed to allege such claims with sufficient particularity.

### (d) Lack of Objections

Prior to trial, the State filed a motion in limine seeking a ruling on the admissibility of evidence regarding Golyar's actions relating to property damage, threats, the shooting at the park, possession of stolen property, and harassment, claiming it was all inextricably intertwined with the charged crimes or, alternatively, was admissible rule 404 evidence.[31] Trial counsel initially resisted the motion, and the State offered evidence in support of admissibility. Before the court ruled on the motion in limine, the parties agreed that all of the evidence at issue was admissible either as evidence that was inextricably intertwined with the charged criminal acts or as evidence of consciousness of guilt. Golyar argues this was ineffective assistance.

The record on appeal is sufficient to review and reject this claim. All of the evidence referenced by Golyar was either inextricably intertwined with the charged crimes or evidence of consciousness of guilt, and thus admissible. Trial counsel

---

[31] See Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016).

could not have performed deficiently by failing to object to admissible evidence.[32]

### (e) Failure to Investigate

Golyar claims her trial counsel was ineffective for failing to investigate potential witnesses or alibis. She does not, however, identify any potential witnesses or alibis or specify what their testimony would have been.

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[33] We find Golyar's allegations are not sufficient to raise this claim on direct appeal, because a potential postconviction court could not identify if a particular failure to call a witness claim or pursue an alibi claim was the same one raised on direct appeal.[34]

### (f) No Rebuttal of Pathologist

Golyar claims trial counsel was deficient in not investigating or calling an expert to rebut the pathologist's testimony. We find this assertion is specific enough to raise the claim of ineffective assistance on direct appeal, but conclude the record on appeal is insufficient to allow us to resolve it.

### (g) Advice Not to Testify

[23-25] Golyar claims her trial counsel was ineffective in advising her not to testify at the bench trial. A defendant has a fundamental constitutional right to testify.[35] The right to

---

[32] See *State v. Custer*, 298 Neb. 279, 903 N.W.2d 911 (2017).

[33] *State v. Loding, supra* note 19.

[34] See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[35] U.S. Const. amend VI; *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017).

testify is personal to the defendant and cannot be waived by defense counsel's acting alone.[36] Defense counsel bears the primary responsibility for advising a defendant of his or her right to testify or not to testify, of the strategic implications of each choice, and that the choice is ultimately for the defendant to make.[37]

[26] Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.[38] Golyar does not claim trial counsel interfered with her freedom to decide whether to testify. Instead, she claims counsel "failed to advise [her] adequately."[39] She argues she had no prior criminal record and thus there was no risk of having that used against her if she testified. She also contends that by not testifying, she was denied the opportunity to explain her multiple instances of harassing and impersonating others. But she makes no allegations as to how counsel deficiently advised her regarding these matters or how his advice not to testify was unreasonable. As such, she has failed to allege deficient performance with enough particularity and has not properly raised this claim on direct appeal.

### (h) Mixing Up Names

Finally, Golyar claims her counsel was "so unprepared and unfamiliar with the issues"[40] that he often used the wrong names when referring to Golyar and Farver. A review of the record shows counsel did slip up at times, and at least twice called Farver by the wrong name. But it is also true

---

[36] *State v. Johnson, supra* note 35.

[37] See *id*.

[38] *Id.*

[39] Brief for appellant at 38.

[40] *Id.*

that throughout the 10-day bench trial, a myriad of names and personas were introduced and discussed. A review of the record, in context, shows counsel's use of the wrong name was infrequent and inadvertent. Moreover, Golyar does not contend, and the record does not suggest, that the court or the issues were confused by counsel's occasional reference to the wrong name.

We conclude this claim has been sufficiently raised, and the record on appeal is adequate for us review it. We further conclude the record refutes this claim of ineffective assistance.

## V. CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences.

AFFIRMED.

MILLER-LERMAN, J., not participating.