IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CARMENATES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOEL J. CARMENATES, APPELLANT.

Filed March 12, 2019.    No. A-18-350.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Christopher Eickholt, of Eickholt Law, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial, Joel J. Carmenates was convicted of theft by deception (property valued at $1,744.53) and criminal possession of four or more financial transaction devices. The Lancaster County District Court sentenced him to a total of 6 to 10 years' imprisonment. Carmenates appeals, claiming his convictions were based on insufficient evidence, his sentences are excessive, and his trial counsel was ineffective in numerous respects. We affirm Carmenates' convictions and sentences, and we find the record sufficient to address all but three of the claims of ineffective assistance of trial counsel.

- 1 -

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

In October 2017, the State charged Carmenates by information with one count of theft by deception (over $1,500) based on events occurring in June 2015. At a hearing on November 16, 2017, the State informed the district court of an alleged codefendant, Yusniel Lopez, and requested to join this case with Lopez' case for trial. The district court joined the cases. With leave of the district court, on November 28 the State filed an amended information to add one count of criminal possession of financial transaction devices (four or more) against Carmenates. Trial began on December 4.

### 2. TRIAL

Maekel Rodriguez, an inmate of "the Lincoln jail," testified that he had known Carmenates since 2012; they had worked together and they both lived in Grand Island, Nebraska. In June 2015, Rodriguez, Lopez, and Carmenates "all came to Lincoln[, Nebraska,] from Grand Island," and "would go to [Lincoln] stores" and "buy gift cards" with "credit cards" that belonged to other people. He, Lopez, and Carmenates "put the money together" and bought "those credit card numbers" online. During that time, Rodriguez bought 30 accounts for $1,000. He had a machine on which he could read and write the provided account information on the "magnetic card" that would "clone" the credit cards. The "cloned" cards were divided up between him, Lopez, and Carmenates (ten cloned cards per person). Rodriguez claimed "everyone" knew the cards were cloned. When Rodriguez used the cloned cards, some transactions were not authorized. If a (cloned) card was approved or declined, (the three men) "would talk about it." Rodriguez went to two wholesale club stores and a department store in Lincoln around June 6 and June 9.

Rodriguez was shown exhibits 24 and 25 (photographs). Rodriguez could not identify specifically which stores were depicted in the photographs, but he did identify Carmenates as the person seen in both exhibits. Exhibit 24 shows a person in a blue shirt with a shopping cart exiting what looks like a store. It was established to be a still photo taken from store surveillance video contained on exhibit 27 (exhibit 3 originally). The relevant video clip shows a self-checkout counter and is date and time stamped June 9, 2015, commencing at approximately 3:29 p.m. We can see the man in the video engaging in multiple transactions at the self-checkout counter, separating items in his cart to be scanned and purchased in separate transactions, with the last transaction taking place at about 3:37 p.m. Notably, at approximately 3:33 p.m., when the man swipes a bank card to complete the purchase of the first items scanned, he returns the bank card to his wallet and pulls out another bank card. After swiping the second bank card, he is able to complete the transaction. This corresponds directly with exhibit 10, a store receipt for $126.08 which shows that an initial transaction with one bank card was declined at that time, but then approved when a different second bank card was used. The man continues to scan additional items and successfully completes multiple purchases, including a bottle that he places in the top "seat" of the shopping cart. That bottle can be seen in the same place in the still photograph (exhibit 24) taken of the man in the blue shirt exiting the store on June 9 at 3:38 p.m. Exhibit 11 shows that the second bank card was used at the same place at 3:35 p.m., and exhibit 12 shows the same bank

card was used at 3:36 p.m. These times all correspond with the times noted in the video when the man swipes a bank card for his multiple purchases at the self-checkout counter. Exhibit 25 depicts an image similar to exhibit 24 (person in blue shirt exiting store with shopping cart), although the location appears to be different.

Toni Frank, a bank employee, testified that she was aware of multiple reports from bank customers about unauthorized transactions using "Visa debit cards" in 2015. She identified exhibits 17 to 20 as bank records she printed (for law enforcement) of the unauthorized transactions. She had highlighted portions on the records "to easily identify the customer's name, the debit card number, [and] the checking account number," thinking those transactions were pertinent to the investigation. She discussed information that was visible on the bank records.

Four customers of that bank testified generally about the bank checking accounts they had in June 2015. Two customers said no one else was on their accounts and both indicated they had a "Visa debit card" that allowed them to access funds from their respective accounts. Two other customers generally stated they had joint accounts and that their husbands had unique or individual debit cards to access funds. All four customers related that they had not lost their actual (physical) cards or authorized anyone to use their cards and that their cards had not been stolen. Generally, each customer pointed out highlighted transactions on their respective bank record (exhibit 17, 18, 19, or 20) that the customer disputed. Those exhibits, which were admitted into evidence, reflect that the disputed charges were made either at a certain department store or wholesale club store in "LINCOLN NE US." The bank apparently refunded the disputed charges. Adam Labanosky, a corporate investigator for the department store who also investigated matters for the wholesale club store in the past, testified about the registers, the receipts, and the characteristics of the two types of video surveillance systems generally used in those stores. The videos and receipts usually had date and time stamps. For this case, he accessed records for June 6 and 9, 2015, to review videos and verify their origin. He indicated that he knows what video to "pull" based on receipt information to find a specific transaction. He identified exhibits 1 to 5 as copies of "video disks" of the stores in Lincoln, exhibit 6 as "the video from another store in Gretna, [Nebraska,]" and exhibits 7 to 16 (receipts) as store receipts. He knew they were Lincoln stores from the store number on receipts. Exhibits 7 to 16 were admitted into evidence. Labanosky explained the meaning of information on the warehouse club store receipts and department store receipts.

The district court subsequently withdrew many of the State's exhibits at the State's request and received the State's offered replacement exhibits into evidence. Exhibit 31 replaced exhibit 1, exhibit 26 replaced exhibit 2, exhibit 27 replaced exhibit 3, exhibit 28 replaced exhibit 4, exhibit 29 replaced exhibit 5; and exhibit 30 replaced exhibit 6. Also, the State said, "one of the two clips that was originally on [e]xhibit 4" that was already withdrawn was replaced with exhibit 32. Aside from exhibit 32, Carmenates stipulated that the replacement exhibits were true and accurate copies of the videos to be withdrawn, except with some information removed. He objected to the offer of exhibit 32 due to "the continuous altering of these videos."

Investigator Donald Fosler of the Lincoln Police Department testified that in June 2015, he investigated several unauthorized debit card transactions that occurred at the wholesale club stores and department store in Lincoln. For each receipt (exhibits 7 to 16), he discussed how he matched up certain data from the receipt with the same data on a specific bank record (exhibits 17 to 20).

He explained how each of those receipts also corresponded or could be traced to the video evidence (although he had no videos for 4 out of 10 receipts related to this case). When he reviewed the videos, he did not know the people depicted. Other jurisdictions gave him "names," and he compared those names to "other videos" he received "from outside that matched [the] same suspects in Lincoln, obtained driver's licenses for both and found them to match." He "determined that [Lopez] and [Carmenates] were two of the parties in the fraud involved [sic]."

The State rested, immediately after which, defense counsel also rested.

### 3. Verdict and Sentence

On December 11, 2017, the jury found Carmenates guilty of theft by deception (property valued at $1,744.53), and criminal possession of four or more financial transaction devices, each issued to different account holders. On February 20, 2018, the district court sentenced Carmenates, consecutively, to 4 to 6 years' imprisonment for the theft by deception conviction, and 2 to 4 years' imprisonment for the criminal possession of financial transaction devices (four or more) conviction. Carmenates received credit for 209 days' time served. He appeals.

## III. ASSIGNMENTS OF ERROR

Carmenates claims, reordered and restated, that (1) there was insufficient evidence to support both of his convictions, (2) the sentences imposed are excessive, and (3) he received ineffective assistance of trial counsel in numerous respects.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Golyar, supra*. We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

In support of his argument that the evidence was insufficient to support the jury's verdicts on both charges, Carmenates first sets forth the statutory elements for each offense, followed by our standard of review. The entirety of his argument then follows:

> Admittedly, an appellate [court] views evidence in the light most favorable to the prosecution, but excluding the improper opinion testimony of Investigator Fosler, [Carmenates] submits that the evidence is insufficient to support the finding of guilt.

> Additionally, had trial counsel preserved and advance[d] an alibi defense that [Carmenates] seemingly claimed, the evidence would not likely have been sufficient to warrant a finding of guilt.

Brief for appellant at 40.

Carmenates' argument in support of this assigned error is based only on his claimed errors of ineffective assistance of trial counsel, which we will address later. Carmenates did not assign error to the admissibility of any evidence, other than to suggest that Investigator Fosler's "opinion testimony" should have been objected to and excluded. He later argues about that evidence in the context of his assigned error regarding trial counsel being ineffective for not making necessary objections related to Investigator Fosler's testimony. Carmenates does not argue that the evidence failed to establish any of the elements of either offense for which he was convicted. Therefore, Carmenates assigned, but did not argue, how there was allegedly insufficient evidence for his convictions; rather, his argument is based only on his claims of ineffective assistance of counsel. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Therefore, we do not address this assignment of error, but will later address Carmenates' arguments related to trial counsel's alleged ineffective assistance insofar as trial counsel failed to make the noted objection to Investigator Fosler's testimony or failed to preserve and advance an alibi defense.

### 2. EXCESSIVE SENTENCE

Carmenates claims his sentences are excessive. He was convicted of theft by deception (property valued at $1,744.53) under Neb. Rev. Stat. § 28-512 (Reissue 2008) and of criminal possession of four or more financial transaction devices each issued to different account holders under Neb. Rev. Stat. § 28-621(4) (Reissue 2008), each of which were Class III felonies at the time. See, Neb. Rev. Stat. § 28-518(1) (Cum. Supp. 2012); § 28-621(4). And at the time, a Class III felony was punishable by a minimum of 1 year of imprisonment, and a maximum of 20 years' imprisonment, a $25,000 fine, or both. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012). The district court sentenced Carmenates to consecutive sentences of 4 to 6 years' imprisonment for theft by deception and 2 to 4 years' imprisonment for criminal possession of four or more financial transaction devices. He was credited for 209 days' time served. Both sentences were well within the statutory range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy, supra*. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *Id.*

The presentence investigation report (PSR) provides the following information. Carmenates, 38 years old at the time, has one prior conviction in 2014 for a "DUI," but he denied driving under the influence. Carmenates was charged with "Fugitive from Another State" in Las Vegas, Nevada, in July 2017. And an "active warrant was located in Adams County, NE" that was issued in April of that year for "Unauthorized Use of a Financial Transaction Device, under $500." A Level of Service/Case Management Inventory (LS/CMI) was conducted. Carmenates' criminal history was scored as a "low risk" on the LS/CMI. He scored "very low risk" for family/marital, "low risk" for alcohol/drug problem, and "medium risk" for education/employment. However, he had a "very high risk" score in the area of companions and a "high risk" score as to leisure/recreation. He scored "very high risk" for a procriminal attitude/orientation. Carmenates appeared to display an attitude "supportive of crime, poor attitude toward supervision, treatment, or unfavorable toward convention," and appeared to not take responsibility for the offense. Carmenates scored "medium risk" for an antisocial pattern; he appeared to display a pattern of "trouble," evidenced by "his criminal history, unemployment, financial concerns, lack of positive relationships . . . and no engagement in prosocial leisure activities." Carmenates reported he was having financial difficulties. His total LS/CMI score was in the medium high risk range to reoffend.

At the sentencing hearing, Carmenates' trial counsel requested concurrent sentences and argued it was a "non-violent offense" and "a fairly low amount, dollar amount." Carmenates had nothing to add. The district court stated it reviewed the PSR. It considered the "serious nature of the offense, the number of victims, the number of times a crime was committed," "the amount of planning that had to take place," and that Carmenates had not taken responsibility for his conduct.

Carmenates now argues that his sentence is lengthy "[d]espite the array of mitigating circumstances" and that the district court did not "meaningfully consider" several factors relevant to sentencing. Brief for appellant at 43. Carmenates believes his criminal history is "minimal and compared to this case, is minor." *Id.* He asserts that the district court should have "explained" the sentence. *Id.*

Carmenates does not state what mitigating circumstances existed and we are not aware of any. While his criminal history was a "low risk," it seems Carmenates is aware that his convictions in this case are more serious than his criminal history. He had other LS/CMI scores of "medium risk" to "very high risk." As is apparent from its statement at the sentencing hearing, the district

court emphasized the nature of the offense. But its sentencing order reflects consideration of other factors as well, including protection of the public, the likelihood that Carmenates would engage in additional criminal conduct if granted probation, and that a lesser sentence would depreciate the seriousness of the crime and promote disrespect for the law. We find no abuse of discretion in the sentences ordered and affirm both sentences.

### 3. Ineffective Assistance of Counsel

Carmenates raises numerous claims of ineffective assistance of trial counsel. Carmenates is represented on direct appeal by different counsel than his trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id*.

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare cases where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id*.

With a few exceptions discussed at the end of this opinion, we find the record is sufficient to address Carmenates' claims of ineffective assistance of trial counsel and determine them to be without merit.

### (a) Failure to File Motion to Sequester Witnesses

Carmenates claims his trial counsel should have moved to sequester witnesses, complaining specifically about Investigator Fosler being present in the courtroom throughout the trial. Neb. Rev. Stat. § 27-615 (Reissue 2016) provides that "[a]t the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order on his own motion." But that "does not authorize exclusion" of "an officer or employee of a party which is not a natural person designated as its representative by its attorney." See § 27-615(2). See generally *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). While Carmenates' trial counsel could have moved to sequester Investigator Fosler, nothing would have precluded the State from filing a notice to designate the investigator as its representative to invoke § 27-615(2). Had the State done so, the only appropriate ruling would have been that the investigator fell outside the limits of any sequestration order the district court may have granted. Therefore, even if trial counsel had argued for sequestration, the result would not have been different. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

### (b) Failure to File Notice of Alibi

Carmenates takes issue with his trial counsel's failure to file a notice of alibi. He alleges that in trial counsel's opening statement, "he seemingly argued that [Carmenates] was not in Lancaster County on the date of the offense and instead was in Grand Island, Nebraska." Brief for appellant at 13. He claims trial counsel stated that Carmenates "was *in* Grand Island on the dates of the offenses," but never filed a notice of alibi as required by Neb. Rev. Stat. § 29-1927 (Reissue 2008). Brief for appellant at 21-22 (emphasis supplied). However, Carmenates' representation of his trial counsel's statement is not accurate. Carmenates' trial counsel's statement was that "[a]t the time of the events alleged by the State[,] [Carmenates] was *living in* Grand Island and gainfully employed." (Emphasis supplied.) It was merely background information. The rest of the opening argument was about Carmenates' denial of the offense and critiques of the State's evidence (for example, "blurry pictures"). Nothing suggested alibi evidence of any sort would be offered. Carmenates says that his trial counsel "never adduced any evidence supporting the assertion that [Carmenates] was in Grand Island on [sic] the time of the offenses." Brief for appellant at 22. However, as noted, trial counsel did not say Carmenates was in Grand Island at the time of the offenses, and therefore his statement did not implicate an alibi defense. Since trial counsel's alleged opening statement is the only basis for Carmenates' claim, we conclude his trial counsel was not deficient for not filing a notice of an alibi.

### (c) Failure to Object to State's Amended Information

Carmenates claims his trial counsel was ineffective for failing to object to the State's request to amend the information to add another charge against Carmenates. He argues that it does not matter whether the district court would have allowed the State to amend the information even if trial counsel had objected. He acknowledges that a ruling on whether to allow a criminal information to be amended is made by the trial court in its discretion. See *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015). He also agrees the "issue does not turn on whether the [S]tate

has the prosecutorial discretion to charge more than one offense. Of course the [S]tate does." Brief for appellant at 23. Rather, he asserts that the issue is only whether his trial counsel should have objected. He contends that this court can "easily assume" that if his trial counsel objected, the district court "might not have permitted" the State's amendment. *Id.* at 24. As support, he points out that the motion to amend was heard just days before the jury trial was to begin, and the district court "had already expressed concern with the logistical difficulties of arranging interpreters for this case." *Id.* He suggests that the inconvenience of additional hearings would likely have dissuaded the district court from allowing the State to add another felony charge the week before trial was to start.

The record refutes that the district court would have denied the State's request to amend when the matter was taken up on November 28, 2017, or alternatively, the record is sufficient to establish that Carmenates could not be prejudiced by trial counsel not objecting to the amendment. Almost 2 weeks earlier, on November 16, the court took up the matter of consolidating Carmenates' case with Lopez' case, and at that time it was discussed that there would be a need for three interpreters (one for each defendant and one for a witness). Any logistical difficulties regarding arranging interpreters had already been addressed and would not have been relevant to any decision regarding the State's motion to amend the information. Additionally, at the November 16 hearing, the State indicated it might be filing motions to add witnesses and "possibly to amend." The court directed the State to file its motions by no later than November 25; implicit in that directive was the court's willingness to entertain such motions so long as they were filed by November 25. The State complied, filing its motion to amend the information in Carmenates' case on November 21.

At the November 28, 2017, hearing on the motion to amend, Carmenates was arraigned on the amended information, and after conferring at that time with his attorney, he personally indicated his waiver of his right to service by sheriff and the 24-hour waiting period before entering a plea. After Carmenates also personally waived his right to a preliminary hearing, he pled "Innocent." Lopez was also arraigned on an amended information in his case; Lopez likewise did not object to his amended information. With the cases consolidated and the amended charges for both Carmenates and Lopez being almost identical, it is very unlikely the district court would have sustained an objection by Carmenates to the State's amended information when (1) the matter was going to proceed on both charges in Lopez' case, and (2) the additional charge of criminal possession of financial transaction devices was based on the same events underlying Carmenates' initial charge of theft by deception.

Finally, even if we were to conclude that Carmenates' trial counsel's performance was deficient because of his failure to object to the amended information, Carmenates cannot establish prejudice. As Carmenates acknowledges, the State has the prosecutorial discretion to charge more than one offense. And, since both offenses arose out of the same set of facts occurring on June 6 and 9, 2015, and the same witnesses and exhibits were applicable to both charges, Carmenates cannot establish prejudice by having to defend both charges at the same time. There is no constitutional right to a separate trial, and a defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense

separately. See *State v. Schroeder*, 279 Neb. 199, 777 N.W.2d 793 (2010). This claim for ineffective assistance of trial counsel fails.

### (d) Failure to Object to State's Motion to Consolidate

Carmenates claims that his trial counsel should have at least objected or resisted consolidation of this case with Lopez' case. The State alleged Lopez and Carmenates were codefendants. The hearing on November 28, 2017, indicated the State charged Lopez with the same counts as Carmenates and almost identical allegations for each count. Carmenates admits that the "factors that a court should consider when determining whether to consolidate cases supported consolidating the matters together for one trial." Brief for appellant at 25. See *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017) (consolidation is proper if offenses are part of factually related transaction or series of events in which both defendants participated). See, also, Neb. Rev. Stat. § 29-2002 (Reissue 2016).

Carmenates does not tell us what objection should or could have been made. See *State v. Wofford, supra* (burden is on party challenging joint trial to show how and in what manner he was prejudiced). See, also, *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013) (there is no constitutional right to separate trial; trial court's ruling on motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent abuse of discretion). Carmenates fails to allege any specific basis upon which his trial counsel could have objected except to say that "[t]he mere appearance of the two men sitting next to one another in the courtroom makes an impression that advances the [S]tate's theory of guilt." Brief for appellant at 25. He does not dispute that the offenses for which he and Lopez were charged were part of a factually related transaction or series of events. See *State v. Wofford, supra*. Further, a defendant is not considered prejudiced by a joinder where the evidence relating to both defendants would be admissible in a trial of either defendant separately. *Id*. Carmenates makes no claim that improper evidence came before the jury merely because of the consolidation of the trial. Therefore, even if trial counsel was deficient for not making an objection, no prejudice can be established, and Carmenates' claim fails.

### (e) Failure to Object to Investigator Fosler's Opinion Testimony

Carmenates asserts that his trial counsel should have objected to Investigator Fosler's allegedly improper opinion testimony. He provides 24 citations to the record in support of his argument, however, we review only those which refer to Carmenates (15 citations refer only to Lopez). The record does not indicate that the State sought to qualify Investigator Fosler as an expert. We therefore consider the propriety of the investigator's opinion testimony as a lay witness.

Lay witnesses may testify only as to factual matters based upon their personal knowledge. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Under Neb. Evid. R. 704, Neb. Rev. Stat. § 27-704 (Reissue 2016), "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." That rule provides that the basic approach to opinions, lay and expert, is to admit them when helpful to the trier of fact. See *State v. Rocha, supra*. However, a witness may not give an opinion as to a defendant's guilt or how the case should be decided, but, rather, must leave the conclusions to be drawn by the trier of fact, because such opinions are not helpful. See *id.* See, also, Neb. Evid. R.

701, Neb. Rev. Stat. § 27-701 (Reissue 2016) (lay witness testimony in form of opinion must be rationally based on perception of witness and helpful to clear understanding of that testimony or determination of fact in issue). Opinion testimony by a lay witness is generally admissible where it is necessary and advisable as an aid to the jury, but it should be excluded whenever the point is reached at which the trier of fact is being told that which it is itself entirely equipped to determine. See *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989).

Investigator Fosler's testimony was based on his investigation and review of much of the evidence in this case, as described earlier. As to the specific questions and answers challenged by Carmenates in this ineffective assistance of counsel claim, we first address the State's questions asking who the investigator believed was shown on video (exhibit 27) and at the register (in video; exhibit 28). Each time, Investigator Fosler identified Carmenates. The State also asked whether it was the investigator's opinion that Carmenates was "still" at the point of sale (in video; exhibit 28), to which Investigator Fosler responded, "Yes." These were merely identification questions, and he could properly provide answers which were rationally based upon his own perception of the evidence.

However, when the State sought the investigator's opinion on whether it was Carmenates who conducted the transactions at issue, this went beyond mere identification and invaded the province of the jury. His opinion on whether Carmenates actually engaged in the transactions at issue was not necessary to aid the jury; the jury was in essence being told what the jury itself was equipped to determine based on the same evidence being relied upon by Investigator Fosler. The following questions and responses (related to Carmenates) were made without objection by Carmenates' trial counsel:

Q. [by the State]: What was your opinion regarding Exhibit 7 [receipt], again the 6099 card and Exhibit 8 [receipt], again 6099 card? What was your opinion regarding who conducted those transactions?

A. [by Investigator Fosler] Carmenates, due to the timing. And the same victim.

. . . .

Q. This video [video; exhibit 28] show[s] again your opinion . . . Carmenates conducting more than one transaction?

A. Yes.

. . . .

Q. [Receipt exhibits] 13 and 14 both . . . Carmenates?"

A. Correct.

. . . .

Q. What was your opinion regarding who you believe conducted this transaction [exhibit 20; bank records]?"

A. It was . . . Carmenates.

. . . .

Q. Exhibit 16 [receipt], did you form an opinion as to who you believed conducted that?"

A. Yes.

Q. Who was that person?

A. . . . Carmenates.

Also, over objections of leading and speculation which were overruled, the State asked: "Do you also believe that [Carmenates], who is here in the courtroom today, is also responsible for the transactions that are depicted in the videos?" Investigator Fosler answered, "I do."

The questioning noted above went a step beyond the investigator merely making an identification of Carmenates based on his own perception. Through his testimony, Investigator Fosler described how certain receipt exhibits matched up to certain exhibits of bank records and that certain receipt exhibits either corresponded directly or impliedly to the timing identified in the video exhibits. He was able to tie specific unauthorized transactions in the paper documents to the person depicted at specific dates and times noted on the store video surveillance. However, it was up to the jury to decide whether it was actually Carmenates engaged in the specific transactions at issue as evidenced through store receipts, bank records, surveillance videos, photographs, and witnesses' testimony. While we conclude that Carmenates' trial counsel was deficient for not objecting to the questions that called for an improper opinion about how the case should be decided, the question still remains as to whether that deficient performance actually prejudiced Carmenates.

In addressing the prejudice component of the *Strickland* test, we focus on whether trial counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013). To show prejudice, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

We conclude that Carmenates would not be able to establish prejudice based on the admission of Investigator Fosler's opinion testimony. We conclude this because there was other evidence linking Carmenates to the unlawful transactions. For example, Rodriguez testified that Carmenates was part of the group purchasing the account numbers to be used on the cloned cards, which were made and used in Lincoln on June 6 and 9, 2015. Rodriguez also identified Carmenates in exhibit 24, which, as noted earlier, is a still photograph taken from exhibit 27 (surveillance video) of transactions made at one of the stores on June 9. The receipts, bank statements, and video surveillance, combined with Rodriguez' identification of Carmenates as the person in the video, provided an independent means for the jury to determine Carmenates' guilt regardless of Investigator Fosler's opinions. The jury also saw Carmenates in the courtroom at trial, and could make their own determination as to whether he was depicted in the video surveillance and photographic evidence. Given the totality of the evidence, Carmenates would not be able to demonstrate a reasonable probability that but for his trial counsel's failure to object to Investigator Fosler's opinion testimony, the result of his trial would have been different. Therefore, this ineffective assistance of counsel claim fails.

### (f) Failure to Object to Various Video Exhibits

Carmenates argues his trial counsel should have objected to the "swapping of [video] exhibits." Brief for appellant at 29. He claims that as a result the jury "saw a blur of exhibits and evidence passed before them in confusing succession." *Id.* Carmenates assumes that the jury "could not quite understand what was going on with these videos" so that Investigator Fosler's testimony about them was more impactful on the jury. *Id.* We cannot agree with Carmenates' assumptions, and his citations reflect only that exhibits were withdrawn and replaced. Because he does not point to any evidence beyond speculation, his claim fails.

### (g) Failure to Adequately Cross-Examine Rodriguez

Carmenates claims his trial counsel should have asked Rodriguez (1) why he was testifying against him and Lopez, (2) what his plea agreement was, and (3) how or if his charges relating to the matter, if any, differed from those of Carmenates and Lopez.

Rodriguez' testimony indicated he was in jail because he pled to some criminal charges for which he had not yet been sentenced. When he "plead or entered a guilty plea," no one promised him anything regarding the outcome of the case. He discussed with his attorney the evidence that the State had against him "and that is why [he] decided to plead" and also believed it was the right thing to do in his situation. After he pled guilty, "someone" (the State) asked him to testify in this case. He was not promised anything for his testimony and no promises were made as to what his sentence would be; he was testifying because he was "taking responsibility for what [he] did one day." He testified generally about his involvement with Carmenates and Lopez in the events that apparently led to this case. On cross-examination, Rodriguez acknowledged that he had "cloned cards four other times" and had four felony convictions in the last 10 years. Two of those convictions were for felonies in Lancaster County.

Carmenates asserts the issue is what Rodriguez' "subjective, personal opinion" was regarding a plea agreement and whether his testimony had "anything to do with his understanding of it." *Id.* at 31. On cross-examination, Rodriguez said it was not his intention that his testimony would lead to a lenient sentence (for him) and claimed he had not discussed with anyone whether his testifying for the State would "benefit" him at his sentencing. Subjective expectations aside, the matters of his plea agreement, criminal history, and his reasons for testifying were well developed, and the jury had ample information from which to judge his credibility. Trial counsel was not deficient, and therefore, this ineffective assistance claim has no merit.

### (h) Failure to Object to Rodriguez' Alleged Hearsay Testimony

Carmenates asserts that his trial counsel should have objected to Rodriguez' "testimony as to what the 'online hacker' stated or said or requested of the men relating to the scheme to obtain bank account information." *Id.* Carmenates does not cite to the record for his claim, but on our review we see two references to "hacker" in Rodriguez' testimony. On direct examination, regarding how he was able to buy accounts online, Rodriguez said: "The money is deposited into an account in which a hacker tells you where to deposit it." Rodriguez did "that." The State asked, "did they provide then the accounts in electronic form to you?" Rodriguez answered affirmatively.

On cross-examination, Rodriguez said he knew the bank that the accounts belonged to because "it comes included in the information that the hacker sends you."

Assuming without deciding that any questions about a "hacker" warranted a hearsay objection, Rodriguez would not be able to establish prejudice based on the limited reference to and relevance of hackers in the criminal prosecution. Rodriguez said he bought 30 account numbers online that cost $1,000. He stated how he cloned credit cards with "the [electronic account] information received." He got the accounts off "a website that has several account numbers and you contact them and then you purchase those accounts." Thus, there was other testimony to establish how Rodriguez bought accounts online with his, Lopez', and Carmenates' money and how Rodriguez used them to clone cards.

Further, Rodriguez explained how the cloned cards were divided up between the three men and how he (Rodriguez) used his cloned cards. There was evidence from Frank and bank customers regarding the customers' compromised bank accounts (of a certain bank, which bank name was on bank records in evidence) and Labanosky explained characteristics of receipts and video surveillance. As Investigator Fosler alleged, the bank records matched up to receipts which in turn corresponded to video surveillance. Therefore, there was other evidence of what bank the compromised accounts belonged to and certainly other evidence implicating Carmenates of the charges. Carmenates would not be able to demonstrate a reasonable probability that but for his trial counsel's failure to object to possible hearsay testimony about hackers, the result of his trial would have been different. Therefore, this ineffective assistance of counsel claim fails.

(i) Failure to Move for Dismissal or Directed Verdict

Carmenates claims his trial counsel was ineffective for not moving to dismiss after the State's case in chief or moving for a directed verdict, but he admits "the record shows that the district court would have overruled such motions." Brief for appellant at 32. He again does not argue that any element of either offense was not proven in the State's prima facie case to warrant those motions.

When considering a criminal defendant's motion for a directed verdict, the State is entitled to have all its relevant evidence accepted as true, every controverted fact resolved in its favor, and every beneficial inference reasonably deducible from the evidence. See *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and verdict may not be directed. *Id*. Carmenates does not argue there was no evidence to support a conviction; rather, he acknowledges that the standard for a defendant to prevail in a motion for a directed verdict is steep. However, he suggests that even though "such a motion might be *pro forma*," it performs a function and "ensures that the district court holds the state to its burden of proof." Brief for appellant at 32. However, to find trial counsel ineffective in this regard, we would have to conclude deficient performance or prejudice, and we can conclude neither. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017).

- 14 -

(j) Failures Related to Opening and Closing Arguments

Carmenates claims his trial counsel should have objected to various statements in the State's opening and closing arguments. Prosecutors generally may not give their personal opinions on the veracity of a witness or the guilt or innocence of the accused. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). But when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. See *id.* In *State v. Hernandez, supra*, the Nebraska Supreme Court found that four statements in a prosecutor's closing argument did not constitute misconduct. It stated that although each of those statements contained the phrases "'the State believes'" or "'the State of Nebraska is asking you,'" merely using such phrases did not turn an otherwise proper summation of the evidence into an improper one. *State v. Hernandez,* 299 Neb. at 927, 911 N.W.2d at 548. It emphasized "that prosecutors could easily avoid an appearance of impropriety by simply substituting 'I believe' or 'the State believes' with the simple phrase 'the evidence shows.'" *Id.* at 928, 911 N.W.2d at 549.

The following are excerpts of the State's opening argument that Carmenates disputes were improper:

> The State believes these videos, and these receipts, bank records are all going to match up.
>
> . . . .
>
> The State believes [Carmenates] was using his own [wholesale club store membership card].
>
> . . . .
>
> [T]he State believes that the evidence is going to show that [Carmenates] successfully used [bank customer's] financial transaction device or accessed her account; [three other bank customers'] debit cards. . . . But [sic] the State's math anyway, the State believes that will show in those receipts that that total was $1,744.53 for the properties they were purchasing . . . .

Those statements are merely arguments of what the evidence would show, which did not constitute prosecutorial misconduct. See *State v. Hernandez, supra.* There was one more disputed statement but it was about what the evidence would show in Lopez' case, which is not relevant here.

The following is disputed from the State's closing argument:

> [1.] [Regarding receipts] [W]e believe [Carmenates did these]. And you can add up those receipts and you should be able to come up with a figure. . . .
>
> . . . .
>
> [2.] The State believes - again if the State did the math correct, but again the State believes the evidence shows that [Carmenates] is guilty of theft by deception . . . . The State believes that, by the State's count, the 10 successful transactions that [Carmenates] had totaled $1,744.52. . . .

[3.] [Talking about jury's opportunity to look at exhibits] I believe in the other situations where there isn't video that, you know, look at the receipt, the signature, the same card member the same things that the investigator talked to you about. These cards being in the same sequence.

. . . .

[4.] I will ask you to go back, review that evidence and I think once you have had that opportunity to do that, you will find . . . [Carmenates] guilty [of both counts].

. . . .

[5.] [I]f you believe [Rodriguez], if you believe it's them in the videos, you use your general knowledge, your common sense, the State believes that you will . . . .

[6.] [A]gain you are instructed that if the evidence supports beyond a reasonable doubt that you are to find [Lopez and Carmenates] guilty and the State believes that you will find them guilty.

The first two statements are merely arguments of what the evidence showed. The third statement simply argues that even where there is no video evidence, other evidence shows transactions were made. The fifth statement appropriately asks the jury to use its general knowledge and common sense in determining what certain evidence showed. The fourth and sixth statements are arguments that the jury will return a guilty verdict based on its review of the evidence; those statements concluded the State's summation of evidence in its closing argument and rebuttal closing argument. See *State v. Hernandez, supra* (prosecutor's closing argument was not improper when it included that State was asking jury, based on totality of circumstances and evidence, to return guilty verdict). The disputed statements from the State's opening and closing arguments were not improper expressions of personal opinion. See *id.* Carmenates' trial counsel was not deficient for failing to make objections to the State's opening and closing arguments as noted.

### (k) Ineffective Arguments at Sentencing

Carmenates claims that his trial counsel was ineffective for not arguing for a lesser sentence or making a substantive argument on his behalf at his sentencing. While he suggests this claim cannot be resolved on direct appeal, we conclude otherwise. Carmenates does not offer anything of substance that could have been argued to mitigate his felony convictions and the nature of the offenses, other than the crime was non-violent and involved a low dollar amount. These were argued by trial counsel and considered by the district court; therefore, there is no merit to this claim.

Carmenates also claims that his trial counsel failed to advise him of his right of allocution and its importance. But at the sentencing hearing, the district court gave Carmenates the chance to speak on his own behalf. Carmenates' trial counsel indicated Carmenates was interested in preserving his right against self-incrimination. Carmenates does not state what he would have said at that time or argue how his statements would have demonstrated a reasonable probability that his sentence would have been any different had he personally spoken at the sentencing hearing. This claim also fails.

(l) Cumulative Effect

Carmenates argues that the cumulative effect of the alleged deficiencies of his preceding ineffective assistance claims amounts to ineffective assistance of trial counsel. Because we have determined that all of the claims upon which Carmenates bases this "cumulative effect" claim had no merit, this claim also fails.

(m) Other Ineffective Assistance Claims

Carmenates claims that our record is insufficient to resolve his remaining ineffective assistance claims. We agree, in part.

*(i) Investigate and Prepare for Trial; Record Insufficient*

Carmenates claims that his trial counsel failed to adequately investigate the case and prepare for trial. He contends that trial counsel failed to communicate with him and rarely visited with him prior to trial. He claims he was never provided with copies of police or investigative reports, nor provided with pretrial motions, pleadings, or orders. We agree that this claim cannot be resolved on the record before us.

*(ii) Advised to Not Testify; Record Insufficient*

He also claims trial counsel improperly advised him to waive his right to testify. He argues that he was unfamiliar with the factual allegations against him, the State's theory of the case, the elements of the crimes, and the options available to him. He claims "the trial process was bewildering and intimidating and his refusal to testify was based on his feeling of incredible unfamiliarity with the process." Brief for appellant at 37. He asserts that trial counsel did not prepare him for the experience nor help him create a meaningful defense, including his right to testify. Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance of counsel in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). While Carmenates has not alleged that trial counsel interfered with his right to testify, the record is not sufficient to determine whether advising Carmenates to waive his right to testify was unreasonable. See *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017) (allegation that counsel wrongly recommended that defendant not testify is sufficiently stated, but record insufficient to review it).

Carmenates also argues that his trial counsel did not discuss or explain an alibi defense and how his testimony could advance that, however, we earlier addressed the lack of merit to this particular claim.

*(iii) Preparation for Sentencing; Record Partially Insufficient*

Finally, Carmenates contends his trial counsel failed to prepare him for sentencing or make an effective argument at sentencing. We have already concluded there is no merit to Carmenates' argument about trial counsel's arguments at sentencing. However, Carmenates also argues that he did not receive a copy of his PSR, nor did his trial counsel discuss the contents of the report with him to confirm the accuracy of information contained therein. He contends he did not have an

- 17 -

opportunity to supplement the report to add letters of support from friends or family and did not have the opportunity to correct or explain damaging information or object to inappropriate information in the report. The record is insufficient to address this portion of Carmenates' claim.

## VI. CONCLUSION

Carmenates' convictions and sentences are affirmed. And other than the three ineffective assistance of trial counsel claims preserved (investigation/preparation for trial; advisement to not testify; preparation for sentencing), the remaining ineffective assistance claims are determined to be without merit.

AFFIRMED.